UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.  14-CIV-60085-BLOOM/Valle

MONICA ALBONIGA, individually
and on behalf of A.M., a minor,

      Plaintiff,

v.

THE SCHOOL BOARD OF BROWARD
COUNTY FLORIDA,

      Defendant.

_____/

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon the Motion for Partial Summary Judgment, ECF

No. [35] (Plaintiff's "Motion"), filed by Plaintiff Monica Alboniga ("Plaintiff"), individually and

on behalf of her minor child, A.M., and the Motion for Summary Judgment, ECF No. [37]

(Defendant's "Motion") filed by Defendant The School Board of Broward County, Florida (the

"School Board" or "Defendant").  The Court has reviewed the Motions, all supporting and

opposing filings and submissions, the Statement of Interest of the United States of America, ECF

No. [43], and the record in the case.  For the reasons that follow, Plaintiff's Motion is granted.

### I.    MATERIAL FACTS

This case involves Defendant's alleged violation of Title II of the Americans with

Disabilities Act, 42 U.S.C. §§ 12131, *et seq.* ("Tittle II" and the "ADA") by implementing

practices, policies and procedures that have subjected the minor plaintiff to discrimination based

on his disability, and violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794

("Section 504") by failing to provide the plaintiff with a reasonable accommodation through its

initial denial of the child's service animal access to his school and then by implementing procedural barriers to the use of that service animal in school.

In January 2012, the School Board began to develop policies and procedures regarding students and employees being accompanied by a service animal in School District facilities. ECF No. [32] (Joint Statement of Undisputed Facts) ¶ 1; *see also* ECF No. [32-1] ("Draft Policies"). These policies were made after reviewing the existing laws, regulations, Department of Justice guidance, and rules promulgated by other school districts in Florida, the Florida Department of Education, and other school districts across the country. Jnt. Stat. ¶ 1. Although the policies and procedures were not formally adopted by the School Board until August 2014, *see* ECF No. [32-2] ("Finalized Policies"), the School Board's administrative staff followed the draft policies and procedures in responding to inquiries from students and employees beginning in January 2013. Jt. Stat. ¶ 2.

A.M. is a six year-old child with multiple disabilities who lives with his mother, Plaintiff Monica Alboniga, both of whom are residents of Broward County, Florida. Jnt. Stat. ¶ 3. A.M. lives with cerebral palsy, spastic quadreparesis, and a seizure disorder; is non-verbal and confined to a wheelchair; and needs care and support for all aspects of daily living and education. *Id*. ¶¶ 6-7. A.M. attends a public school in Broward County, Florida. *See*, *e.g.*, ECF No. [36-1] (Alboniga Decl.) ¶ 7. An Individualized Education Plan ("IEP") was created by A.M.'s teachers and other school staff with input from Plaintiff on May 15, 2013. Jnt. Stat. ¶ 4. At the time, A.M. was attending the A.R.C. Pre-School program. *Id*. A.M.'s IEP dated May 15, 2013, states that A.M.'s Program Eligibilities include Intellectual Disability, Orthopedically Impaired, Visually Impaired, and Language Impaired. *Id*. ¶ 5.

At some point prior to development of the May 15, 2013 IEP, Plaintiff determined that A.M. required a seizure alert and response dog to protect A.M. when he has seizures.  Plaintiff paid to find and train a seizure alert and response dog for A.M.  ECF No. [36-2] (Dulniak Decl.) ¶ 4.  Plaintiff obtained a service animal, named Stevie, to assist A.M.  Alboniga Decl. ¶ 4; Dulniak Decl. ¶ 2.  Stevie received all training in accordance with Assistance Dog International Standards for training and behavior.  Dulniak Decl. ¶ 7.  Stevie was specifically trained to provide A.M. with assistance in the event of a seizure or medical emergency regardless of the environment in several specialized tasks.  *Id.* ¶ 9.  Those tasks include "cover," in which Stevie was trained to step up on A.M.'s wheelchair and lay across his lap in the event of a seizure.  "Cover" provides A.M. with several benefits:  Stevie can keep A.M.'s head up and prevent airway distraction or choking on saliva during a seizure episode; it helps calm A.M. during outbursts and helps disrupt abnormal behaviors or movements; and it provides A.M. with a tactile presence which can help arouse A.M. out of an episode.  *Id.*  Stevie was also trained to "tell" or "alert" human responders in the event that A.M. was experiencing a medical crisis.  *Id.* ¶ 10.  This includes activating a sensor mat by stepping, jumping on or passing across the mat which sets off an alarm; going for help, physically alerting a human responder, and then returning to and staying with A.M.; or otherwise acting in a way to bring attention to the medical situation.  *Id.* ¶¶ 10-12.  Stevie was also equipped with a special vest which carried pertinent medical supplies and information important for the care of A.M. in an emergency.  *Id.* ¶ 13.

Plaintiff has submitted declarations, not controverted by Defendant, that Stevie and A.M. form a "service dog team."  Dulniak Decl. ¶¶ 11, 15-16.  Separation of a service animal from the target member of its team is detrimental in diminishing the animal's responsiveness and effectiveness, reducing the animal's ability to respond and perform tasks for its target, and

disrupting the animal-target bond that is important to the effective working connection between members of the service dog team.  *Id*.  These negative effects carry over even when the service dog team is reconnected.  *Id*.

On or about May 15, 2013, Plaintiff spoke to Wladimir Alvarez from the Equal Education Opportunity Office of the School Board regarding her son being allowed to be accompanied by a service dog at school for the 2013/14 school year.  Jnt. Stat. ¶ 8.  On or about May 23, 2013, Mr. Alvarez mailed correspondence to Plaintiff, including a copy of a Request for Use of Service Animal in School District Facilities form.  *Id*. ¶ 9.  On or about July 22, 2013, the School Board received the completed Request for Use of Service Animal in School District Facilities form from Plaintiff, including a copy of the service dog's vaccinations.  *Id*. ¶ 10.  The School Board's policies and procedures requested information regarding liability insurance for the service animal, proof of which was not provided by Plaintiff.  *Id*. ¶ 11.  In addition, the vaccinations of the service dog listed on the information provided by Plaintiff did not correspond with the required vaccinations in the School Board's policies and procedures.  *Id*.  The vaccinations required by the School Board mirror those applicable to dog breeders to ensure the health of the dog before its sale, *see* Fla. Stat. § 828.29, and exceed those related to the regulation of animals permitted in schools, *see* Fla. Stat. § 828.30, Fla. Admin. Code. 6A-2.0040.

By August 15, 2013, the School Board had not agreed to Plaintiff's request for accommodation for her son, and sent her a letter requesting additional vaccinations and liability insurance for a professionally trained service animal.  Jnt. Stat. ¶ 12.  The letter requested a certificate of current liability insurance covering the service animal and identifying the School District as an additional insured, with the amount of insurance coverage determined by the School District's Risk Management Department.  *Id*.  It further requested proof the following vaccinations: Distemper, Hepatitis, Leptospirosis, Paroinfluenza, Parvovirus, Coronatvirus, DHLPPC, and

Bordetella.  *Id.*  Then, on August 16, 2013, the School Board informed Plaintiff that she needed to provide a "handler" for the dog.  *Id.* ¶ 13.

A.M. began attending Nob Hill Elementary School ("Nob Hill") as a kindergarten student in August 19, 2013.  *Id.* ¶ 15.  Nob Hill is a public school under the auspices of the School Board.  *Id.*  A.M. has attended Nob Hill in accordance with his IEP during the 2013/14 and 2014/15 school years.  *Id.* ¶ 16.  Since Plaintiff obtained the service dog, at all times A.M. has attended school accompanied by his service dog.  *Id.*  Plaintiff served as the "handler" for A.M.'s service dog from August 2013 until November 2013.  *Id.* ¶ 13.  She was not paid by the School Board for doing so, nor did she assist school staff with any care or activities regarding A.M. in the classroom.  *Id.* ¶¶ 14, 18.  In November 2013, while continuing to maintain that it is not responsible for the care and supervision of A.M.'s service animal, which includes being the animal's "handler," the School Board made an administrative decision to provide an employee to be the "handler" for A.M.'s service dog.  *Id.* ¶ 19.  Since that time, the School Board has provided a "handler" for A.M.s' service dog.  *Id.*  That "handler" is also the school's custodian. Alboniga Decl. ¶ 10.  The "handler" received training from the same individual who initially trained Stevie.  Jnt. Stat. ¶ 20.

The "handler's" only responsibilities in school are the following: to walk Stevie alongside A.M. with a leash instead of allowing Stevie to be attached to A.M.'s wheelchair via a tether; to take Stevie outside of the school premises to urinate; and to ensure that other people do not approach, pet or play with Stevie while he is working as a service dog.  *Id.* ¶¶ 21-22, 24.  The "handler" does not have any duties regarding A.M.'s education or care.  *Id.*  At all times while at home and in other public places, Stevie is tethered to A.M.  Alboniga Decl. ¶¶ 6, 11.  There is nothing preventing Stevie from going outside to urinate tethered to A.M.  Jnt. Stat. ¶ 24.  Stevie

is trained to physically indicate when he needs to urinate.  Dulniak Decl. ¶ 17.  While at school, Stevie does not eat or drink.  Jnt. Stat. ¶ 23.  Nor does Stevie defecate or make stains, or require cleaning or exercise, while at school.  Alboniga Decl. ¶ 14.  Plaintiff attends to Stevie's daily feeding, cleaning and care needs.  *Id.* ¶ 6.

The School Board employs an Exceptional Student Education (ESE) teacher and two paraprofessionals in A.M.'s classroom to aid A.M. in his activities, and  has provided special training to school staff to ensure A.M.'s safety and treatment during a seizure.  ECF No. [37-1] (Marek Decl.) ¶¶ 6-8.  The ESE teacher and paraprofessionals have been trained to recognize seizure symptoms, seizure precautions and detection, as well as to provide care and emergency treatment for A.M. when he has a seizure.  *Id.* ¶ 9.  This includes lifting A.M. from his wheelchair, safely laying him on the ground, and administering a suppository to address the seizure.  *Id.*  Currently, A.M. has seizures every other night.  Alboniga Decl. ¶ 5.  Stevie alerts Plaintiff approximately thirty to forty minutes prior to the seizure, and during the seizure, performs the "cover" task to assist A.M.  *Id.* ¶ 5.  No school staff at A.M.s' school has observed this behavior from the service dog.  Jnt. Stat. ¶ 17.

At Plaintiff's request, a Section 504 meeting was held on September 19, 2013.  *Id.* ¶ 25. While A.M. has had an IEP since he began as a pre-kindergarten student in the Broward County public school system, he has never has a Section 504 plan.  *Id.* ¶ 26.  At this meeting, a health care plan was developed outlining the School Board's responsibilities regarding care for A.M. if and when he had a seizure at school.  *Id.* ¶ 25.  The health care plan was incorporated into A.M.'s IEP.  *Id.*  Neither A.M.'s health care plan nor his IEP includes his use of a service dog at school.  *Id.*  During this meeting, the School Board expressed its position that it was not

responsible for the care or supervision of a service animal, which includes handling the service animal.  *Id.*

On January 31, 2014 and again on May 7, 2014, an IEP was created and updated by A.M.'s teachers and other school staff with input from Plaintiff.  *Id.* ¶ 27.  Both of these IEPs continue to state that A.M. is visually impaired, has a seizure disorder, spastic quadreparesis, and cerebral palsy.  *Id.*  A.M. maintained the same program eligibilities and, in addition, was made eligible at the May, 7, 2014 meeting to receive some of his special education services at home.  *Id.* A.M.'s IEP continues not to include his use of a service animal at school.

## II.   SUMMARY JUDGMENT STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The parties may support their positions by citation to the record, including *inter alia*, depositions, documents, affidavits, or declarations.  Fed. R. Civ. P. 56(c).  An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  A fact is material if it "might affect the outcome of the suit under the governing law."  *Id.* (quoting *Anderson*, 477 U.S. at 247-48).  The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor.  *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Howard v. Steris Corp.*, 550 F. App'x 748, 750 (11th Cir. 2013) ("The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor.").  However, material facts set forth in the movant's statement of facts and supported by record evidence are deemed admitted if not controverted by the opposing party.  S.D. FLA. L. R. 56.1(b).

"[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)).   The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact.  *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008).  Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'"  *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).   Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor.  *Shiver*, 549 F.3d at 1343.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party."  *Brooks v. Cnty. Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006).  Even where an opposing party neglects to submit any alleged material facts in controversy, the court must still be satisfied that all the evidence on the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment.  *Reese v. Herbert*, 527 F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

### III.   JURISDICTION

Defendant poses two challenges to the Court's jurisdiction over the instant action.  First, Defendant maintains that Plaintiff has failed to exhaust her administrative remedies under the IDEA (as defined below), thereby divesting this Court of jurisdiction to resolve her claims under the ADA and Section 504.  Second, Defendant argues that Plaintiff's claims are moot as the School Board has continuously permitted A.M. to attend school accompanied by his service animal.  The Court will address each issue in turn.

### A.      Exhaustion of Administrative Remedies

While Plaintiff asserts claims under Title II of the ADA and Section 504, Defendant maintains that due to Plaintiff's failure to exhaust the administrative remedies available under Section 1415(f) of the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.* (the "IDEA"), the Court lacks subject matter jurisdiction over the instant action.  Plaintiff does not dispute that she has not undertaken the relevant administrative procedures but submits that they were not required here.  The Court agrees.

The IDEA guarantees that disabled students receive a "free and appropriate public education" ("FAPE") through the provision of various special education services, including an "individualized education program" ("IEP"), as defined in 20 U.S.C. § 1414(d).  *J.P. v. Cherokee Cnty. Bd. of Educ.*, 218 F. App'x 911, 912 (11th Cir. 2007) (citing *Loren F. ex rel. Fisher v. Atlanta Indep. Sch. Sys.*, 349 F.3d 1309, 1311 (11th Cir. 2003)).  "The philosophy of the IDEA is that plaintiffs are required to utilize the elaborate administrative scheme established by the IDEA before resorting to the courts to challenge the actions of the local school authorities."  *N.B. v. Alachua Cnty. Sch. Bd.,* 84 F.3d 1376, 1378 (11th Cir. 1996).  The Eleventh Circuit has long held that "whether claims asserting the rights of disabled children are brought pursuant to the IDEA, the ADA, Section 504, or the Constitution, they must first be exhausted in state

administrative proceedings" propounded under the IDEA.  *M.T.V. v. DeKalb County School Dist.*, 446 F.3d 1153, 1158 (11th Cir. 2006); *A.L. ex rel. P.L.B. v. Jackson Cnty. Sch. Bd.*, 543 F. App'x 1002, 1005 n.4 (11th Cir. 2013) ("The exhaustion requirement applies to claims asserting the rights of disabled children under not only the IDEA, but also the Americans with Disabilities Act (ADA), § 504 of the Rehabilitation Act of 1973, and the Constitution."); *Babicz v. School Bd. of Broward Cty.*, 135 F.3d 1420, 1422 (11th Cir. 1998) ("[C]laims asserted under Section 504 and/or the ADA are subject to Section 1415(f)'s requirement that litigants exhaust the IDEA's administrative procedures to obtain relief that is available under the IDEA before bringing suit under Section 504 and/or the ADA.") (following *Hope v. Cortines*, 69 F.3d 687 (2d Cir. 1995) and *Charlie F. by Neil F. v. Board of Educ. of Skokie School District 68*, 98 F.3d 989 (7th Cir. 1996)).

Where exhaustion of IDEA administrative remedies is required, a plaintiff's "failure to exhaust administrative remedies by requesting and participating in a due-process hearing will result in dismissal of the civil action."  *Cherokee*, 218 F. App'x at 913 (explaining that "exhaustion is a prerequisite to the civil action"); *but see N.B. by D.G. v. Alachua County Sch. Bd.*, 84 F.3d 1376, 1378 (11th Cir. 1996) (noting that "exhaustion requirement . . . is not jurisdictional and therefore is not to be applied inflexibly") (citation omitted).

"Consistent with the unambiguous statutory language, which provides that '*any* matter *relating to* the identification, evaluation, or educational placement of the child, or the provision of a [FAPE] to such child,' 20 U.S.C. § 1415(b)(6) (emphasis added), [the Eleventh Circuit has] interpreted the IDEA's exhaustion requirement as applying to a 'broad' spectrum of claims."  *Cherokee*, 218 F. App'x at 913 (quoting *M.T.V.*, 446 F.3d at 1158).  Thus, if the relief sought by a plaintiff can be provided by the IDEA or relates to the provision of a FAPE or development of

an IEP under the IDEA, the plaintiff's ADA or Section 504 claims will fail absent the plaintiff's exhaustion of administrative remedies.  *See*, *e.g.*, *Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 248 (2d Cir. 2008) (affirming that administrative exhaustion was required where the "relief appellants seek, namely permission to bring the service dog to school, is in substance a modification of [the] IEP and is available under the IDEA," determining that "[a] request for a service dog to be permitted to escort a disabled student at school as an 'independent life tool' is [] not entirely beyond the bounds of the IDEA's educational scheme"); *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002) (finding that IDEA's exhaustion requirement applies to "IDEA-based claim[s]" brought pursuant to section 1983); *Jennifer B. v. Chilton County Bd. of Educ.*, 891 F.Supp.2d 1313 (M.D. Ala. 2012) (equal participation in preschool program and claim for reimbursement for alternative services pertains to issues and conduct for which the IDEA contemplates relief, such that plaintiff was required to exhaust administrative remedies prior to bringing ADA and Section 504 claims); *Barnett v. Baldwin Cnty. Bd. of Educ.*, --- F.Supp.3d ---, 2014 WL 5023413, at *9 (S.D. Ala. Oct. 8, 2014) (constitutional claims were "inextricably intertwined with the development of an IEP plan and the ability of the students to receive appropriate educational services" are therefore required administrative exhaustion); *EF ex rel. Fry v. Napoleon Cmty. Sch.*, 2014 WL 106624, at *4 (E.D. Mich. Jan. 10, 2014) ("If the relief sought by Plaintiffs could have been provided by the IDEA, then exhaustion was necessary and Plaintiffs' complaint must be dismissed.").

However, a theory of ADA Title II or Section 504 liability need not be predicated on a denial of a FAPE or related to improper development of an IEP as required by the IDEA.  *See*, *e.g.*, *K.M. ex rel. Bright v. Tustin Unified School Dist.*, 725 F.3d 1088, 1099-1100 (9th Cir. 2013) (distinguishing theories of liability under Title II of the ADA, Section 504 and the IDEA, and

rejecting argument that "the success or failure of a student's IDEA claim dictates, as a matter of law, the success or failure of her Title II claim"); *Ellenberg v. New Mexico Military Inst.*, 478 F.3d 1262, 1282 (10th Cir. 2007) ("[E]ven if plaintiffs conceded that [defendant] fully satisfied its IDEA obligations . . ., they could pursue claims under the ADA . . . .").  Where a plaintiff's claims are not based on or potentially remedied by the IDEA, the IDEA's administrative exhaustion requirements do not apply.  *See*, *e.g.*, *J.V. ex rel. Ortiz v. Seminole County School Bd.*, 2005 WL 1243756 (M.D. Fla. May 25, 2005) (holding that *Babicz* could not be read to require administrative exhaustion prior to assertion of Section 1983 claims which were not "IDEA-based" and which sought relief not available under the IDEA); *AP ex rel. Peterson v. Anoka-Hennepin Indep. Sch. Dist. No. 11*, 538 F. Supp. 2d 1125, 1152 (D. Minn. 2008) (no requirement of exhaustion where Section 504 claims for failure to accommodate diabetic student's need for administration of insulin and testing of blood sugar were not IDEA-type claims and related only tangentially to his education); *B.M. v. Bd. of Educ. of Scott Cnty., Ky.*, 2008 WL 4073855, at *6 (E.D. Ky. Aug. 29, 2008) (administrative exhaustion was not required where allegations, which arose from "concerns about how blood sugar monitoring would be conducted and insulin administered" at school, were "not related to the way that Defendants provided an education" and were "independent" of the IDEA); *Sullivan by & through Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 951 (E.D. Cal. 1990) (no requirement of exhaustion under IDEA's predecessor prior to suit for relief under Rehabilitation Act where disabled student sought to be accompanied by service dog at school but did not dispute the adequacy of educational program or aver that service dog was educationally necessary); *see also Franklin v. Frid*, 7 F. Supp. 2d 920, 925 (W.D. Mich. 1998) ("[A] disabled child who asserts a constitutional claim having some relationship to education but no nexus to the IDEA is not

required to pursue administrative remedies under the IDEA before filing suit under" a separate statutory of constitutional theory).

Considering facts strikingly similar to those in the case at bar, the court in *Sullivan* explained:

> Defendants' argument is premised on the erroneous assumption that plaintiff claims she is being deprived of a "free appropriate public education" within the meaning of EHA [IDEA's predecessor] as a result of defendants' decision to exclude her service dog from the school premises.  Plaintiff, however, does not dispute that the IEP created for her pursuant to EHA is adequate from an educational standpoint, nor has she alleged that the service dog is educationally necessary.  Properly construed, plaintiff's claim is that whether or not the service dog is educationally necessary, defendants have discriminated against her on the basis of her handicap by arbitrarily refusing her access if she is accompanied by her service dog.

*Sullivan*, 731 F. Supp. at 951.  The same is true regarding Plaintiff's allegations here.  Plaintiff does not claim that A.M. has been denied a free and appropriate public education.  Plaintiff does not claim that A.M.'s IEP is in any way deficient.  Plaintiff does not claim that A.M.'s service animal is educationally necessary, or that the School Board's provision of A.M.'s education would be impacted by the presence of the service animal.  Defendant, in point of fact, agrees. Elsewhere in its submissions, Defendant argues that the service animal is not necessary for or relevant to A.M.'s educational experience – that the services provided by the animal are performed through other means by school staff in order to provide A.M. a FAPE in accordance with his IEP.  *See* Defendant's Mtn. at 15; Defendant's Resp. at 6.  Plaintiff asserts claims for violation of the ADA and Section 504 regardless of Defendant's compliance with the IDEA. The IDEA and its administrative scheme are simply not implicated by Plaintiff's claims here.  As such, exhaustion of those procedures is not a prerequisite to this action.

### B.     Mootness

Defendant argues that there is no active case or controversy before the Court because the School Board has always and continues to allow A.M. to attend school with his service animal. Nevertheless, this case is not moot.

"Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of 'Cases' and 'Controversies.'" *Mingkid v. U.S. Atty. Gen.*, 468 F.3d 763, 768 (11th Cir. 2006).  "A federal court has no authority 'to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.'" *Harrell v. The Florida Bar*, 608 F.3d 1241, 1265 (11th Cir. 2010) (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 12 (1992)).  "The doctrine of mootness derives directly from the case-or-controversy limitation because 'an action that is moot cannot be characterized as an active case or controversy.'" *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1335 (11th Cir. 2001) (quoting *Adler v. Duval County Sch. Bd.*, 112 F.3d 1475, 1477 (11th Cir. 1997)).  "A case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehabilitative Servs.*, 225 F.3d 1208, 1216-17 (11th Cir. 2000) (quoting *Powell v. McCormack,* 395 U.S. 486, 496 (1969)).  "Put another way, '[a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." *Id*. (quoting *Ethredge v. Hail*, 996 F.2d 1173, 1175 (11th Cir. 1993)).

"It has long been the rule that voluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e.*, does not make the case moot." *Nat'l Adver. Co. v. City of Miami*, 402 F.3d 1329, 1333 (11th Cir. 2005) (quotation omitted); *see also Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000). "Otherwise a party could moot a challenge to a practice simply by changing the practice during

the course of the lawsuit, and then reinstate the practice as soon as the litigation was brought to a close." *Jews for Jesus, Inc. v. Hillsborough Cnty. Aviation Auth.*, 162 F.3d 627, 629 (11th Cir. 1998).  "Accordingly, the voluntary cessation of challenged conduct will only moot a claim when there is no 'reasonable expectation' that the accused litigant will resume the conduct after the lawsuit is dismissed."  *Nat'l Ass'n of Boards of Pharmacy v. Bd. of Regents of the Univ. Sys. of Ga.*, 633 F.3d 1297, 1310 (11th Cir. 2011) (quoting *Jews for Jesus*, 162 F.3d at 629).  "In other words, when a party abandons a challenged practice freely, the case will be moot only if it is '*absolutely clear*' that the allegedly wrongful behavior could not reasonably be expected to recur."  *Harrell*, 608 F.3d at 1265 (emphasis in original; quoting *Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117, 1131 (11th Cir. 2005)).

"Generally, the 'party asserting mootness' bears the 'heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again.'"  *Nat'l Ass'n of Boards of Pharmacy*, 633 F.3d at 1310 (quoting *Friends of the Earth*, 528 U.S. at 189).  Three factors are relevant in conducting a mootness inquiry:  (1) "whether the termination of the offending conduct was unambiguous;" *id*. (citing *Troiano v. Supervisor of Elections*, 382 F.3d 1276, 1283 (11th Cir. 2004) (noting that "government actor[s enjoy] a rebuttable presumption that the objectionable behavior will *not* recur")); (2) "whether the change in government policy or conduct appears to be the result of substantial deliberation, or is simply an attempt to manipulate jurisdiction;" *id*. (citing *Christian Coal. of Ala. v. Cole*, 355 F.3d 1288, 1292-93 (11th Cir. 2004) (holding that a challenge to the application of state judicial canons was rendered moot where voluntary cessation was based on consideration of new Supreme Court precedent and "not made so as to merely avoid a ruling by the federal court")); and (3) "whether the government has consistently applied a new policy or adhered to a new course of conduct."  *Id*.

Here, the School Board has permitted A.M. to attend school with his service animal and has provided an employee to act as a handler for the service animal. This has been permitted solely by an administrative decision that is in derogation of its own policies and procedures.  The School Board's policies implementing its interpretation of 28 CFR § 35.136 states that "[i]n the case of a young child or a student with a disability who is unable to care for and supervise his/her service animal, a handler provided by the parent is responsible for providing care and supervision of the animal."  Finalized Policies at 5.  They provide no discretion to the School Board to provide any accommodation or assistance.  A change in government conduct by administrative fiat in violation of its own rules cannot constitute "unambiguous" or "consistent" termination of allegedly improper conduct.  This Court need not address whether the School Board reversed-course because of negative publicity in local media, as Plaintiff suggests. However, it is not at all clear that the complained of conduct will not recur once threat of a lawsuit is removed.  *See Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1188 (11th Cir. 2007) (holding that defendant's new policy permitting access for service animals did not moot plaintiff's Title III ADA and Section 504 claims, explaining that "[defendant] has not met its 'formidable,' 'heavy burden' of meeting the Supreme Court's 'stringent' standard for mootness in a private voluntary cessation case – showing that it is 'absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur'").  Plaintiff's claims are not moot and this Court has jurisdiction to consider them.

## IV.   ANALYSIS

### A.      Title II, Section 504 and the Relevant Implementing Regulations

The ADA was enacted in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."   42 U.S.C. § 12101(b)(1).  Congress found that "discrimination against individuals with disabilities persists

in such critical areas as . . . education, . . . and access to public services" and "individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of . . . overprotective rules and policies, [and the] failure to make modifications to existing . . . practices . . . ." *Id.* §§ 12101(a)(3), (5).

Title II of the ADA prohibits discrimination on the basis of disability in all of a public entity's "services, programs, and activities." *Id.* § 12132; 28 C.F.R. §35.130(a).  Section 504 similarly prohibits such discrimination by entities that receive federal financial assistance. 29 U.S.C. § 794.  Coverage broadly includes the countless programs, services, and activities of public schools and state and local education departments and agencies. *See* 42 U.S.C. § 12131; 28 C.F.R. § 35.104.  The requirements under Title II to make "reasonable modifications of policies, practices, and procedures," and the requirement under Section 504 to make "reasonable accommodations," are, except with respect to causation, materially identical. *Bledsoe v. Palm Beach Cnty. Soil & Water Conservation Dist.*, 133 F.3d 816, 821 (11th Cir. 1998) ("Congress intended Title II to work in the same manner as Section 504 of the Rehabilitation Act."); *Bennet-Nelson v. La. Bd. of Regents*, 431 F.3d 448, 454 (5th Cir. 2005) (explaining that the only material difference between the rights and remedies afforded plaintiffs under Title II and Section 504 lies in their respective causation requirements, but that this difference was immaterial where the plaintiff's claims are based on a failure to make reasonable accommodations for disabled individuals).

Pursuant to the ADA's mandate that the Attorney General of the United States promulgate regulations implementing Titles II and III of the ADA, the United States Department of Justice (the "DOJ") issued regulations under each title in 1991 – both of which contain provisions relating to covered entities' obligations to make reasonable modifications in policies,

practices, or procedures when necessary to avoid discrimination on the basis of disability.  *See*

42 U.S.C. §§ 12134(a), 12186(b); 28 C.F.R. §§ 35.130(b)(7), 36.302.  The relevant provision of

the 1991 Title II regulation provides, in full:

> "A public entity shall make reasonable modifications in policies, practices, or procedures
> when the modifications are necessary to avoid discrimination on the basis of disability, unless
> the public entity can demonstrate that making the modifications would fundamentally alter the
> nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).

On July 23, 2012, the Attorney General issued revised regulations under Title II and III

of the ADA that "comport with the Department [of Justice]'s legal and practical experiences in

enforcing the ADA since 1991."  ADA Title II Regs., Dept. of Just. Manual Comment § 8-

2.400H (Sep. 15, 2010); 75 Fed. Reg. 56,164 (Sep. 15, 2010).  The revised regulations contain

certain provisions enforcing the ADA with respect to the use of service animals in public entities,

such as public schools and other public facilities.  *See* 28 C.F.R. § 35.136.  The regulation

provides that "[g]enerally, a public entity shall modify its policies, practices, or procedures to

permit the use of a service animal by an individual with a disability."  *Id*. § 35.136(a).  In further

provides, in relevant part, as follows:

> (b)  Exceptions.   A public entity may ask an individual with a disability to
> remove a service animal from the premises if (1) The animal is out of control and
> the animal's handler does not take effective action to control it; or (2) The animal
> is not housebroken.
>
> (d)  Animal under handler's control.  A service animal shall be under the control
> of its handler. A service animal shall have a harness, leash, or other tether, unless
> either the handler is unable because of a disability to use a harness, leash, or other
> tether, or the use of a harness, leash, or other tether would interfere with the
> service animal's safe, effective performance of work or tasks, in which case the
> service animal must be otherwise under the handler's control (e.g., voice control,
> signals, or other effective means).
>
> (e)  Care or supervision.   A public entity is not responsible for the care or
> supervision of a service animal.

(g)  Access to areas of a public entity.  Individuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go.

(h)  Surcharges.  A public entity shall not ask or require an individual with a disability to pay a surcharge, even if people accompanied by pets are required to pay fees, or to comply with other requirements generally not applicable to people without pets. If a public entity normally charges individuals for the damage they cause, an individual with a disability may be charged for damage caused by his or her service animal.

Id. §§ 35.136(b), (d), (e), (g) and (h).

Plaintiff's Title II and Section 504 claims, and the parties' cross-motions, are predicated on whether the School Board adhered to the statute's relevant implementing regulations regarding A.M.'s use of his service animal at school.

### B.     The Relevant Implementing Regulations Are Permissible and Consistent

The School Board contends that the DOJ exceeded its statutory authority in promulgating the Title II service animal regulatory provision, 28 C.F.R. § 35.136, and that that provision is inconsistent with, and impermissibly stricter than, the regulatory provision requiring that public entities make reasonable modifications to avoid discrimination on the basis of disability, 28 C.F.R. § 35.130(b)(7).  The DOJ's regulations and interpretations thereof – which are entitled to significant deference here – are a permissible construction of the ADA.  Furthermore, the Title II service animal regulatory provision is consistent with and a specific application of the reasonable modifications regulatory requirement.  The regulations are, therefore, valid and are enforceable against the School Board in assessing its adherence to the ADA.

### 1.      Deference Under *Chevron*

The DOJ's regulation interpreting Title II is entitled to deference under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  *See Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1179 (11th Cir. 2003) (deferring to the Department's regulation

implementing Title II of the ADA); *Bledsoe*, 133 F.3d at 822-23 (same).  Under *Chevron*, an agency's interpretation of its governing statute is entitled to judicial deference unless "Congress has directly spoken to the precise question at issue."  *Chevron*, 467 U.S. at 842.  Thus, where, as here, "Congress has explicitly left a gap for the agency to fill," the agency's regulations are "given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 843-44; *see Shotz*, 344 F.3d at 1178 ("If the delegation is express, 'any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute.'") (quoting *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001)).

Courts have consistently applied *Chevron* (or equivalent) deference to the DOJ's regulations enforcing Title II of the ADA.  *See Albra v. Advan, Inc.*, 490 F.3d 826, 832 (11th Cir. 2007) (noting that *Chevron* deference is accorded to DOJ regulations interpreting and implementing the ADA provisions); *Kornblau v. Dade Cnty.*, 86 F.3d 193, 194 (11th Cir. 1996) ("Regulations promulgated by the Department of Justice interpreting the ADA are, of course, entitled to considerable weight."); *Armstrong v. Schwarzenegger*, 622 F.3d 1058, 1065 (9th Cir. 2010) ("Department of Justice regulations interpreting Title II should be given controlling weight unless they are 'arbitrary, capricious, or manifestly contrary to the statute.'"); *see also Frame v. City of Arlington*, 657 F.3d 215, 225 (5th Cir. 2011) (significant deference); *Wisconsin Community Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 n. 10 (7th Cir. 2006) (DOJ regulations entitled to respect).

The question for the Court is whether the agency's regulation is based on a "permissible" construction of the statute.  *Id.* at 843.  "A permissible construction of the statute is one which is reasonable in light of the language, policies, and legislative history of the statute."  *United States*

*v. Bd. of Trustees for Univ. of Alabama*, 908 F.2d 740, 746 (11th Cir. 1990) (citing *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131 (1985)).  This is a highly deferential standard.  To uphold the agency's interpretation of a statute, a court need not conclude that the agency's interpretation is the best interpretation, *see Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Serv.*, 545 U.S. 967, 980 (2005), or the "most natural one," *see Pauley v. BethEnergy Mines, Inc.*, 501 U.S. 680, 702 (1991) – but simply that it is "permissible."  *See Univ. of Alabama*, 908 F.2d at 746 (deference to agency in determining whether regulation is permissible construction of statute, in Section 504 context); *Shotz*, 344 F.3d at 1178-79 (same, regarding DOJ regulations in ADA context).

### 2.    The Regulations Are Permissible

The DOJ's Title II regulations regarding service animals are clearly a permissible interpretation of the ADA.  As part of Title II of the ADA, 42 U.S.C. § 12132 promulgates the ADA and prohibits discrimination against qualified individuals based on their disability, while 42 U.S.C. § 12134 grants the Attorney General regulatory power regarding the ADA.  Section 12132 provides:  "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Section 12134 provides:  "the Attorney General shall promulgate regulations in an accessible format that implement [Title II]."  42 U.S.C.A. § 12134(a).  Nowhere does Title II explicitly address the issue of service animals or in what capacity to require public entities to reasonably accommodate individuals with disabilities with regard to their use.  Because Congress has not directly spoken to the issue, the DOJ's regulations are entitled to deference if they are reasonable in light of the language and purpose of the ADA and unless they are arbitrary, capricious, or manifestly contrary to the ADA.

The regulation at issue – 28 C.F.R. § 35.136 – which honors the choice of an individual with a disability to be accompanied by a service animal in all aspects of community life, including at school, is a reasonable construction of the ADA because it promotes the statute's overarching goals of ensuring equal opportunity for, and full participation by, individuals with disabilities in all aspects of civic life.  *See* 42 U.S.C. § 12101(a)(3) (noting that discrimination persists in education); *id*. § 12101(a)(7) (ADA's goals "are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency"); *see also Bledsoe*, 133 F.3d at 821 (purpose of Title II is to "continue to break down barriers to the integrated participation of people with disabilities") (quoting H.R. Rep. No. 101-485(II), at 49-50 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 445, 472-73).  The regulation fulfills these statutory goals by carrying out Congress's direction that the ADA not merely prohibit outright discrimination, but that it go further to require "modifications to existing facilities and practices" to accommodate individuals with disabilities.  *Id.* § 12101(a)(5); *see Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 598 (1999) ("Congress had a more comprehensive view of the concept of discrimination advanced in the ADA.").

The ADA's legislative history confirms that the DOJ regulations are consistent with Congressional intent that individuals with disabilities generally and where reasonable not be separated from their service animals, including in schools.  *See* H.R. Rep. No. 101-485(II), at 106 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 303, 389 ("Refusal to admit [a] dog . . . is tantamount to refusing to admit the person who is in need of the dog."); 28 C.F.R. Pt. 36, app. C § 36.302 at 916 (July 1, 2014) (Congress intended that "individuals with disabilities are not separated from their service animals"); *see also Hearing Before the S. Comm. on Labor & Human Resources*, 101st Cong. 188 (1989) (statement of Sen. Harkin) ("[P]eople with disabilities are entitled to lead independent and productive lives, to make choices for themselves, and be integrated and mainstreamed into society.").  This comports with Congress's recognition

that because "[a] person with a disability and his . . . [service] animal function as a unit,"

involuntarily separating the two generally "[is] discriminatory under the [ADA]."  135 Cong.

S.10,800 (1989) (statement of Sen. Simon).

Further, the thrust of the regulation at issue – that the ADA generally requires public

entities to permit individuals with disabilities to be accompanied by their service animals – has

enjoyed extensive judicial support, both before and after the DOJ added the specific service

animal provision to its Title II regulations.  *See*, *e.g.*, *Sak v. City of Aurelia, Iowa*, 832 F. Supp.

2d 1026, 1039 (N.D. Iowa 2011) (holding that 28 C.F.R. § 35.136 was entitled to *Chevron*

deference and furthered Congressional intent under the ADA, and relying on the regulation to

preliminarily enjoin municipality from preventing plaintiff from keeping his physical therapy

service animal in contravention of a general ordinance prohibiting possession of a pit bull);

*Alejandro v. Palm Beach State Coll.*, 843 F. Supp. 2d 1263, 1269-71 (S.D. Fla. 2011) (relying on

Title II regulation's service animal provision to preliminarily enjoin college from preventing

plaintiff's access to all areas of campus with her service animal); *Crowder v. Kitagawa*, 81 F.3d

1480, 1484 (9th Cir. 1996) (quarantine law denies visually-impaired individuals who depend on

guide dogs "meaningful access to state services, programs, and activities"); *Newberger v. La.

Dep't of Wildlife & Fisheries*, 2012 WL 3579843, at *4 n.6 (E.D. La. Aug. 17, 2012) (public

entities have the same legal obligations as public accommodations to make reasonable

modifications to allow service animals access); *Pena v. Bexar Cnty., Tx.*, 726 F. Supp. 2d 675,

685 (W.D. Tex. 2010) (same); *Rose v. Springfield- Greene Cnty. Health Dep't*, 668 F. Supp. 2d

1206, 1214 n.9 (W.D. Mo. 2009) (same).

### 3.    The Regulations Are Consistent

Furthermore, the service animal regulatory provision, 28 C.F.R. § 35.136, is consistent

with and a specific application of the reasonable modification regulatory requirement, 28 C.F.R.

§ 35.130(b)(7).  As noted above, 28 C.F.R. § 35.130(b)(7) requires that a public entity "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).  Misunderstanding the regulations, the School Board interprets the service animal provision to forego that reasonableness analysis.  Rather, 28 C.F.R. § 35.136 directly applies the section 35.130(b)(7) framework, and presents the DOJ's holistic view, in enforcing the ADA, of when it is reasonable, and when it is unreasonable, to require public entities to accommodate the use of service animals.

The service animal provision of the DOJ's Title II regulation requires that public entities, such as the School Board, generally permit individuals with disabilities to use their service animals.  28 C.F.R. § 35.136(a).  Providing specific guidance with respect to issues that may arise in the application of this rule, the provision sets forth, among other things:  the requirement that individuals with disabilities be permitted to be accompanied by their service animals "in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees . . . are allowed to go" (section 35.136(g)); and the general prohibition against requiring individuals who use service animals to pay a surcharge or to comply with requirements generally not applicable to people without pets (section 35.136(h)).

Conversely, the DOJ regulations enumerate specific exceptions and limitations to the general rule.  These exceptions, set forth at 28 C.F.R. §§ 35.104, 35.130(b)(7), 35.136(b), and 35.139, establish that while allowing individuals with disabilities to use their service animals *generally* is reasonable (*i.e.*, reasonable in the run of cases), there are certain circumstances when requiring public entities to permit their use would not be reasonable.  As an initial matter, the

general requirement applies only to dogs that are "individually trained to do work or perform tasks for the benefit of an individual with a disability."  28 C.F.R. § 35.104 (definition of "service animal").  Further, a public entity need not allow an individual to use his service animal if it would fundamentally alter the nature of the entity's service, program, or activity, or if it would pose a direct threat to the health or safety of others.  *Id.* §§ 35.130(b)(7), 35.139; *see* 28 C.F.R. pt. 35, app. A § 35.104 at 600; *id.* § 35.136 at 608 (July 1, 2014).  Further, "[a] service animal shall be under the control of its handler," and "[a] public entity is not responsible for the care or supervision of a service animal."  28 C.F.R. §§ 35.136(d), (e).  And a service animal may be properly excluded if it "is out of control and the animal's handler does not take effective action to control it," or if the animal "is not housebroken."  28 C.F.R. § 35.136(b).

This interpretation of the interaction between sections 35.130(b)(7) and 35.136, which is in any event clear on the face of the regulations, is endorsed by the DOJ itself.  *See* Statement of Interest of the United States of America, ECF No. [43] at 12.  The Court must "defer to an agency's interpretation of its own regulation, advanced in a legal brief, unless that interpretation is plainly erroneous or inconsistent with the regulation."  *Chase Bank USA, N.A. v. McCoy*, 562 U.S. 195, 131 S. Ct. 871, 880 (2011); *see also Fortyune v. City of Lomita*, 766 F.3d 1098, 1104 (9th Cir. 2014) (DOJ's interpretation of its ADA implementing regulations, including as advanced in an amicus brief, entitled to controlling weight unless it is plainly erroneous or inconsistent with the regulation) *Bonilla v. U.S. Dep't of Justice*, 2012 WL 3759024, at *5 (S.D. Fla. Aug. 29, 2012) (following DOJ interpretation of its FOIA regulations, for having met "three preconditions:  (i) the interpretation relates to ambiguous language in a regulation; (ii) there is no reason to suspect that the interpretation does not reflect the agency's fair and considered

judgment on the matter in question; and (iii) the agency's reading of its regulation must be fairly

supported by the text of the regulation itself" (citations omitted)).

> **4.      The Regulations Are Valid and Enforceable Against the School Board**

In sum, the DOJ's regulations implementing Title II of the ADA regarding the use by a

disabled person of a service animal in a public entity, and the accommodation that entity must

make to permit such use, are valid, internally consistent, and therefore enforceable against the

School Board in the instant matter.

> **C.      Assessing Plaintiff's Reasonable Accommodation Claim**

> **1.      Framing Plaintiff's Claim For Failure to Accommodate**

"[F]ailure to accommodate is an *independent* basis for liability under the ADA."

*Wisconsin Cmty. Servs., Inc. v. City of Milwaukee*, 465 F.3d 737, 751 (7th Cir. 2006) (emphasis

in original); *see also Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007)

(explaining, in Title III context that, so long as other requirements met, "an employer's failure to

reasonably accommodate a disabled individual itself constitutes discrimination under the ADA");

*Muhammad v. Court of Common Pleas of Allegheny Cnty., Pa.*, 483 F. App'x 759, 763 (3d Cir.

2012) ("[A] plaintiff can assert a failure to accommodate as an independent basis for liability

under the ADA and [Section 504].")); *McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir.

2004) (failure to make reasonable accommodates sufficient to state ADA claim); *Henrietta D. v.

Bloomberg*, 331 F.3d 261, 276-77 (2d Cir. 2003) ("[A] claim of discrimination based on a failure

reasonably to accommodate is distinct from a claim of discrimination based on disparate

impact."), *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1166 (1st Cir. 2002) (addressing an

ADA Title III claim, held that "[i]n addition to forbidding disparate treatment of those with

disabilities, the ADA makes it unlawful for an employer to fail to provide reasonable

accommodations for the known physical or mental limitations of otherwise qualified individuals

with disabilities, unless the accommodations would impose an undue hardship on the operation of the business").

"In order to state a Title II claim, a plaintiff generally must prove (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that the exclusion, denial of benefit, or discrimination was by reason of the plaintiff's disability." *Bircoll v. Miami-Dade Cnty.*, 480 F.3d 1072, 1083 (11th Cir. 2007); *see also Cash v. Smith*, 231 F.3d 1301, 1305 (11th Cir. 2000) ("Discrimination claims under the Rehabilitation Act are governed by the same standards used in ADA cases."); *Sutton v. Lader*, 185 F.3d 1203, 1207 (11th Cir. 1999) ("To establish a prima facie case of discrimination under the [Rehabilitation] Act an individual must show that (1) he has a disability; (2) he is otherwise qualified for the position; and (3) he was subjected to unlawful discrimination as the result of his disability.").

The parties do not dispute that A.M. is a qualified individual under the first prong.  Nor do they dispute that the School Board is a "public entity" or Stevie a "service animal" within the meanings established by the statute and relevant regulations.

As to the third prong, "[i]f establishing discrimination by failure to make reasonable accommodation, a plaintiff who satisfies the first two prongs meets the last prong merely by showing that a reasonable accommodation was not provided." *Pardo v. Napolitano*, 2009 WL 3448181, at *2 (S.D. Fla. Oct. 26, 2009) (citing *Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1255 (11th Cir. 2001)); *Nadler v. Harvey*, 2007 WL 2404705, at *5 (11th Cir. Aug. 24, 2007) ("If establishing discrimination by failure to make reasonable accommodation, a plaintiff must merely show that (1) he was disabled, (2) he was otherwise qualified, and (3) a reasonable

accommodation was not provided."). The ADA imposes only a "but-for" causation standard for liability, rather than a proximate causation standard. *McNely v. Ocala Star-Banner Corp.*, 99 F.3d 1068, 1077 (11th Cir. 1996) ("'because of' conveys the idea of a factor that made a difference in the outcome"). The third prong would thus examine whether, but for his disabilities, A.M. would have been subjected to the alleged discrimination, *i.e.*, the lack of reasonable accommodation on his use of his service animal. The policies implemented by the School Board pertain specifically to the use of service animals. *See*, *e.g.*, Final Policies at 4 (defining "service animal" subject of the policies as one "trained to do work or perform tasks for the benefit of an individual with a disability"). Their impact on A.M. can only be because of his disabilities and consequent need to utilize a service animal. *See*, *e.g.*, *Holly*, 492 F.3d at 1261-62 and n.17 (explaining that third prong requires demonstration that plaintiff's need for the denied reasonable accommodation was due to his disability). The current dispute therefore centers on the second prong – whether the School Board has discriminated against A.M. by failing to provide him a reasonable accommodation.

As embodied in 28 C.F.R. § 35.130(b)(7), "[t]he ADA's 'reasonable modification' principle . . . does not require a public entity to employ any and all means to" accommodate an individual with disability, "but only to make 'reasonable modifications' that would not fundamentally alter the nature of the service or activity of the public entity . . . ." *Bircoll*, 480 F.3d at 1082. Here, the School Board has not argued that the accommodation – permitting A.M. to attend school accompanied by his service dog without forcing him to pay for a separate handler and other attendant charges, such as additional liability insurance – would "fundamentally alter" the nature of the educational services it provides. How could it? After all,

the School Board has temporarily permitted that accommodation throughout the pendency of this action without experiencing any disruption to its educational activities.

As such, the case turns on whether the School Board's policies constitute a failure to provide A.M. a reasonable accommodation – or conversely, whether the School Board's polices are, in fact, a reasonable accommodation – as articulated in 28 C.F.R. § 35.136.  At this point, it pays to spell out exactly what accommodations Plaintiff is requesting.  Plaintiff asks that the School Board permit A.M. to attend school accompanied by his service dog without having to provide a separate "handler" for the dog and without having to pay for additional liability insurance and additional vaccinations.  Considering A.M. the dog's "handler," Plaintiff further asks the School Board to accommodate him by accompanying A.M. and the animal outside of the school premises when it needs to urinate.  Whether those accommodations are reasonable requires the Court to apply the specific facts of this case to the explicit language of the relevant regulatory provisions.

### 2.    Reasonableness of the Requested Accommodations

### a.    Regulatory Interpretation, Generally

Courts must employ the same canons of construction when construing regulatory language as apply to statutory construction.  *See Cremeens v. City of Montgomery*, 602 F.3d 1224, 1227 (11th Cir. 2010) ("We apply the canons of construction to regulations as well as to statutes"); *Miami Heart Inst. v. Sullivan*, 868 F.2d 410, 413 (11th Cir. 1989) (canons of statutory construction applied equally to regulatory language).  "As a general rule of interpretation, the plain meaning of a regulation governs."  *Evenson v. Hartford Life & Annuity Ins. Co.*, 244 F.R.D. 666, 667 (M.D. Fla. 2007) (citing *KCMC, Inc. v. F.C.C.*, 600 F.2d 546, 549 (5th Cir. 1979); *see Frank Diehl Farms v. Sec'y of Labor*, 696 F.2d 1325, 1331 (11th Cir. 1983) ("In the absence of clearly expressed contrary legislative intention, the plain language of the statute

controls its construction.").  However, regulations are to be "interpreted with a common sense regard for regulatory purposes and plain meanings."  *United States v. Frade*, 709 F.2d 1387, 1401 (11th Cir. 1983).  "In interpreting a regulation, each part or section should be construed in connection with every other part or section so as to produce a harmonious whole." *Miami Heart*, 868 F.2d at 413 (citation omitted).

### b.   Insurance and Vaccination Requirements

The School Board's requirement that Plaintiff maintain liability insurance for A.M.'s service animal and procure vaccinations in excess of the requirements under Florida law is a surcharge prohibited by 28 C.F.R. § 35.136(h).  The School Board's policies require what amounts to an extra upfront fee charged to Plaintiff in order for A.M. to use his service animal at school.  The insurance costs are over and above what other students are required to expend in order to attend school.  Moreover, the vaccinations exceed those ordinarily required under Florida law regarding the regulation of animals permitted in schools.  Those requirements, therefore, constitute an impermissible discriminatory practice.

### c.   Control, Care and Supervision of the Service Animal

The closer question is whether 28 C.F.R. §§ 35.136(d) and (e) render the accommodations sought by Plaintiff reasonable or unreasonable.

### i.   Analytic Background

The Title II service animal regulations direct the Court to start with the overarching proposition that permitting a disabled person use of a service animal is generally reasonable.  *See* 28 C.F.R. § 35.136(a).  That is, in the vast majority of cases, an accommodation requested by a disabled person of a public entity to permit use of a service animal will be considered reasonable. This is especially so once the possibility that the accommodation would "fundamentally alter" the entity's activities are removed. This is the case here.

CASE NO.  14-CIV-60085-BLOOM/Valle

The Court is also guided by the basic premise that while not every accommodation chosen by a disabled person is "reasonable," a public entity is not permitted to survey the universe of possible accommodations or modifications and determine for the individual what, in its estimation, is the best or most "reasonable," approach.  *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 402 (2002) (holding, in Title I ADA case, that a plaintiff "need only show that an 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases") (citations omitted); *Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1059 (5th Cir. 1997) (holding, in Title III ADA case, that plaintiff need only demonstrate "that the requested modification is reasonable in the general sense, that is, reasonable in the run of cases").

On this point, a recent in-District case decided under the Fair Housing Act, 42 U.S.C. § 3601, *et seq.* ("FHA"), is particularly illustrative.  *See Sabal Palm Condominiums of Pine Island Ridge Ass'n, Inc. v. Fischer*, 6 F. Supp. 3d 1272 (S.D. Fla. 2014).  In *Sabal*, the plaintiff sought to keep a service dog in her condominium as a reasonable accommodation under the FHA; the condominium association, which maintains a no-pets policy, refused her request for accommodation.  *Id*. at 1275-76.  The FHA forbids discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap."  42 U.S.C. § 3604(f)(2). Prohibited discrimination includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a disabled person an] equal opportunity to use and enjoy a dwelling."  42 U.S.C. § 3604(f)(3)(B). In rejecting the plaintiff's request, the association determined that she had not substantiated her need for a service dog.  *Sabal*, 6 F. Supp. 3d at 1277.  The association also argued that even if a dog was reasonable or necessary in order to secure for plaintiff an equal opportunity to use and

enjoy her dwelling as required under the FHA, a dog over 20 pounds (which the plaintiff's dog

was) was not reasonable or necessary. *Id*. at 1282.  The Court concluded that the plaintiff was

disabled within the meaning of the FHA, and that her requested accommodation was necessary

to afford her an equal opportunity to use and enjoy her home. *Id*. at 1281.  It then explained its

determination that the plaintiff's requested accommodation was reasonable as follows:

> [T]he most fundamental problem with the argument that a dog over 20 pounds
> was not necessary is that it gets the law wrong.  [The association]'s implied
> argument – that even if a dog is reasonable or necessary for [plaintiff], a dog 20
> pounds or under would suffice – is akin to an argument that an alternative
> accommodation (here, a dog under 20 pounds), would be equally effective in
> meeting [plaintiff]'s disability-related needs as a dog over 20 pounds. . . . There
> may be instances where a provider believes that, while the accommodation
> requested by an individual is reasonable, there is an alternative accommodation
> that would be equally effective in meeting the individual's disability-related
> needs.  In such a circumstance, the provider should discuss with the individual if
> she is willing to accept the alternative accommodation.  However, providers
> should be aware that persons with disabilities typically have the most accurate
> knowledge about the functional limitations posed by their disability, and an
> individual is not obligated to accept an alternative accommodation suggested by
> the provider if she believes it will not meet her needs and her preferred
> accommodation is reasonable. . . . Since a dog over 20 pounds is a reasonable
> accommodation, [plaintiff's] (commonsense) belief that a dog over 20 pounds – in
> particular, a dog of [her dog's] size – is better able to assist her renders the need to
> evaluate alternative accommodations unnecessary as a matter of law.  That a blind
> person may already have a cane or that he or she could use a cane instead of a dog
> in no way prevents the blind person from also obtaining a seeing-eye dog as a
> reasonable accommodation under the FHA.  A contrary result is absurd.

*Id*. at 1282-83.

The situation here is analogous.  The School Board argues that A.M.'s ESE-trained

educators can and do provide him with the same seizure detection and care measures provided by

his dog, Stevie.  That may be.  But refusing Plaintiff's requested accommodation if it is

reasonable in favor of one the School Board prefers is akin to allowing a public entity to dictate

the type of services a disabled person needs in contravention of that person's own decisions

regarding his own life and care.  As the *Sabal* court reasoned, it would be like refusing a blind

person access for her service animal because, in the public entity's view, a cane works fine.  That result *would* be absurd.  The analysis, under Title II of the ADA as under the FHA, must focus only on whether the requested accommodation is reasonable under the specific circumstances particular to the individual in question.  *See Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) ("Whether an accommodation is reasonable depends on specific circumstances."); *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996) (holding in a Title II ADA case that whether a proposed accommodation is "reasonable" is a question of fact).

In addition, in assessing the reasonableness of Plaintiff's requested accommodation, there is no factual dispute that separating A.M. from his service animal during the school day would have a detrimental impact on the human-animal bond and would diminish the animal's responsiveness and effectiveness outside of the school setting.  Neither does the School Board contest the medical and other benefits Stevie provides A.M. outside the school setting.  The importance of a service dog team has further been recognized by courts and Congress in the context of the same rights Plaintiff asserts here.  *See Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077, 1087 (N.D. Cal. 2013) (finding that separating an individual from his service animal can cause irreparable harm and deprive that individual of independence); *Lentini v. California Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004) (public accommodation was required to modify its policies by admitting plaintiff's service animal; in part due to human-dog bond, modification was "necessary" even though plaintiff could be "accompanied by an able-bodied companion, and even though the defendant offered the assistance of specially-trained staff"); 135 Cong. Rec. S.10,800 (1989) (statement of Sen. Simon) ("[a] person with a disability and his . . . [service] animal function as a unit" such that separating the two generally "[is] discriminatory under the [ADA]").

33

ii.        **Handler and Control Under 28 C.F.R. § 35.136(d)**

Turning to the specific regulatory provisions at issue, 28 C.F.R. § 35.136(d) provides that "[a] service animal shall be under the control of its handler."  28 C.F.R. § 35.136(d).  By implication, requiring a public entity to act as handler for and to control the service animal would not be a reasonable accommodation mandated by the ADA.  On that basis, the School Board argues that it cannot be required to provide a handler for Stevie.  It further maintains that A.M., due to his disabilities, cannot act as the dog's handler.  Therefore, it concludes that, even if it is required to permit A.M. access for Stevie during school, Plaintiff is responsible for acting as or providing for a handler.  The undisputed facts presented here do not bear out that conclusion.

Unfortunately, there is very little in the way of case-law guidance as to what constitutes a "hander" with "control" over a service animal for purposes of these regulations.  One case had occasion to consider an identical provision with respect to public accommodations under the ADA.  *See Shields v. Walt Disney Parks & Resorts US, Inc.*, 279 F.R.D. 529 (C.D. Cal. 2011).  Resolving a motion to certify under Rule 23, the *Shields* court explained that the ADA regulations in question, 28 C.F.R. § 36.302(c)(4), which also provide that "[a] service animal shall be under the control of its handler," "specifically prohibit the practice of leaving a service animal unattended." *Id*. at 547.  The implication is that the opposite of a service animal being under "control" of a "handler" is its being unattended.

The complete language of the regulatory provision itself – which explicitly permits tethering as handling – is also instructive.  Further explaining its requirement that a service animal be under the "control" of a "handler," the regulation provides that "[a] service animal shall have a harness, leash, or other tether, unless either the handler is unable because of a disability to use a harness, leash, or other tether, or the use of a harness, leash, or other tether would interfere with the service animal's safe, effective performance of work or tasks, in which

case the service animal must be otherwise under the handler's control (e.g., voice control, signals, or other effective means)."  28 C.F.R. § 35.136(d).  Thus, normally, tethering a service animal to the wheelchair of a disabled person constitutes "control" over the animal by the disabled person, acting as the animal's "handler."  And, even absent tethering, voice controls or signals between the animal and the disabled "handler" can constitute "control."

Here, it is undisputed that, at all times outside of school – including while at home and in other public places – Stevie is tethered to A.M.  Stevie is fully trained.  Throughout the school day, Stevie simply stays by A.M.'s side.  The sole exception is when Stevie needs to urinate and Stevie is trained to physically indicate (*i.e.*, poke) when he so requires.  Given the specific facts here, having Stevie tethered to A.M. in school would constitute control by A.M. over his service animal as the animal's handler within the meaning of the regulation.  As such, permitting A.M. to attend school with Stevie tethered to him would be a reasonable accommodation required of the School Board.

### iii.        Care and Supervision Under 28 C.F.R. § 35.136(e)

The final regulatory provision at issue provides that "[a] public entity is not responsible for the care or supervision of a service animal."  28 C.F.R. § 35.136(e).  The definition of "care or supervision" is in dispute.  The School Board maintains that leading Stevie outside to urinate constitutes care or supervision, for which it cannot be made responsible.

As noted above, an agency's interpretation of its own regulation is entitled to significant deference.  *See supra*, § IV.B.3.  The DOJ's guidance to the revised ADA regulations explains, with regard to the "care or supervision" sub-provision, that:

> [There may be] occasions when a person with a disability is confined to bed in a hospital for a period of time.  In such an instance, the individual may not be able to *walk or feed* the service animal.  In such cases, if the individual has a family member, friend, or other person willing to take on these responsibilities in the

place of the individual with disabilities, the individual's obligation to be responsible for the care and supervision of the service animal would be satisfied.

28 C.F.R. Pt. 35, App. A (emphasis added).  The clear implication is that "care or supervision" means routine animal care – such as feeding, watering, walking or washing the animal.

Similar regulatory provisions enacted at the state level confirm that interpretation.  In defining "care or supervision" relevant to the rights of individuals with disability and the protection against discrimination of those using service animals, Florida law provides:

The care or supervision of a service animal is the responsibility of the individual owner.  A public accommodation is not required to provide *care* or *food* or a *special location* for the service animal or assistance with *removing animal excrement*.

Fla. Stat. § 413.08(3)(d) (emphasis added).  In its "Guidelines for School Districts on the Use of Service Animals by Students with Disabilities," the Florida Department of Education has provided:

A service animal is the personal property of the student.  The district school board does not assume responsibility for *training, daily care, or healthcare* of service animals."

ECF No. [36-3] at 1-7 of 51.  The upshot is that "care or supervision" equates to general upkeep and routine animal maintenance – such as feeding, curbing, training or healthcare.

In addition, there is some case law surrounding this issue.  The Supreme Court of Montana – considering its opinion in accordance with the persuasive force its reasoning warrants – had occasion to directly and in detail consider the meaning of "care or supervision" under 28 C.F.R. § 36.302 (as noted above, an ADA regulation parallel to section 35.136).  *See McDonald v. Dep't of Envtl. Quality*, 2009 MT 209, 351 Mont. 243, 214 P.3d 749 (Mont. 2009).  The *McDonald* court considered a request that an employer provide a nonskid floor surface (such as runners or carpeting) to permit a disabled employee to use her service animal to move freely about the employment space.  The court first noted that the required accommodation "[wa]s

36

analogous to requiring an employer to provide a ramp or widen a door so that an employee may use his wheelchair to travel from one part of the building to another.  When an employer does the latter (e.g., widens a door), it is an accommodation to the employee using the wheelchair, not to the wheelchair itself."  *Id.*, 2009 MT 209 ¶ 50, 351 Mont. at 261, 214 P.3d at 761.  It then determined "that 'supervising or caring for' a service animal under § 36.302(c)(2) means looking after the service animal in the owner's absence."  *Id.*, 2009 MT 209 ¶ 59, 351 Mont. at 264, 214 P.3d at 763.

Also in the context of 28 C.F.R. § 36.302, the court in *Tamara v. El Camino Hosp.*, 964 F. Supp. 2d 1077 (N.D. Cal. 2013) considered a request by an individual with physical disabilities that a hospital facility permit her service animal to accompany her in the hospital's locked psychiatric ward.  The *Tamara* court granted the plaintiff a preliminary injunction based in part on its determination that the hospital could have provided her the reasonable accommodations of "allow[ing] her to care for her dog's hygiene needs:  allowing her, with supervision, out of the locked ward to take [the dog] into the hospital's outside area."  *Id.* at 1086.  Finally, *Shields*, 279 F.R.D. at 548, suggests that the process of securing a service animal when not under their owner's control amounts to "care or supervision" under 28 C.F.R. § 36.302(c)(5).

Taken together, the DOJ guidance, similar regulatory provisions, and non-precedential authority explain that "care and supervision" refers to routine or daily overall maintenance of a service animal.  The pivotal question here is whether accommodating A.M. by assisting him to lead his dog outside the school to relieve itself is part of that routine overall maintenance.  The Court finds that, under the undisputed facts here, it does not.

Recall, the only accommodation requested involves Stevie's urination.  While at school, Stevie does not eat or drink.  Nor, while at school, does Stevie defecate or make stains, or require cleaning or exercise.  Plaintiff attends to Stevie's daily feeding, cleaning, training, and all other "care or supervision" needs, outside of school and on her own time and dime.[1]

Here, the distinction drawn by the *McDonald* court is instructive.  The School Board is not being asked to provide an employee to walk Stevie.  Rather, the School Board is being asked to help A.M. do so.  That is, the School Board is being asked to accommodate *A.M.*, *not* to accommodate, or care for, Stevie.  Requiring the School Board to hire an additional employee to allow Stevie to urinate outside school grounds may be a part of "care or supervision."  Or, as Plaintiff suggests, it may be below the level of routine maintenance (*i.e.*, not as involved or burdensome as curbing or feeding).  *See*, *e.g.*, *C.C. v. Cypress Sch. Dist.*, 2011 U.S. LEXIS 88287, at *11-12 (C.D. Cal. Jun. 13, 2011) (granting preliminary injunction based on finding that requiring school to provide an aide "to hold the dog's leash when navigating campus, provide the dog with water, and tether an untether [the dog] to plaintiff occasionally throughout the day" would neither fundamentally alter the school's educational program nor necessarily pose an unreasonable accommodation).  But the Court need not decide that issue.

The question here is whether requiring the School Board to assist or monitor A.M. in using his service animal is a reasonable accommodation under the circumstances.  In the same way a school would assist a non-disabled child to use the restroom, or assist a diabetic child with her insulin pump, or assist a physically disabled child employ her motorized wheelchair, or assist

---

[1] The School Board does not actually contend that having its staff ensure that no other children inappropriately interact with Stevie during the school day would not be a reasonable accommodation.  Saying so would be akin to requiring a blind student to hire a separate individual to watch guard over his seeing-eye dog.  Requiring a school to instill and enforce appropriate conduct on the part of the students in its charge is certainly reasonable (if not, perhaps, of its most important functions).

a visually disabled child deploy her white cane, or assist that same child with her seeing-eye dog – the accommodations here are reasonable.

### 3.      The Requested Accommodations Are Reasonable

As explained in detail above, the accommodations requested by Plaintiff under the precise circumstances present here are reasonable within the meaning of the regulations implementing the ADA.  With Stevie tethered to A.M., given Stevie's training and obedience, and A.M. thereby acting as Stevie's handler, the School Board is required to accommodate A.M. by (through its staff) assisting him and accompany Stevie outside of the school premises to urinate at the infrequent occasions when it is necessary to do so during the school day.  The School Board may not, by general policy or otherwise, require Plaintiff to maintain additional liability insurance for Stevie in respect of A.M.'s use of the dog in connection with his schooling.  The School Board may not require, by general policy or otherwise, that Plaintiff obtain vaccinations for Stevie in excess of those normally required under Florida law in connection with the regulation of animals permitted in schools.

## V.    CONCLUSION

For the foregoing reasons, it is hereby **ORDERED and ADJUDGED** as follows:

1.      Defendant's Motion for Summary Judgment, ECF No. [37], is **DENIED**.

2.      Plaintiff's Motion for Partial Summary Judgment, ECF No. [35], is **GRANTED**, as specifically set forth herein.

3.      Defendant's practices, policies and procedures have subjected the minor plaintiff A.M. to discrimination based on his disability in violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131, *et seq.* and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

4.      Defendant is permanently enjoined to provide the minor plaintiff A.M.

reasonable accommodation in assisting him with use of his service animal, in the specific manner described herein, *supra* § IV.C.3.

5.      Defendant is permanently enjoined from, by general policy or otherwise,

      a.      requiring Plaintiff to maintain additional liability insurance for A.M.'s service animal in respect of A.M.'s use of the service animal in connection with his schooling; and

      b.      requiring that Plaintiff obtain vaccinations for A.M.'s service animal in excess of those normally required under Florida law in connection with the regulation of animals permitted in schools.

**6.**      No later than February 17, 2015, the parties shall request from Magistrate Judge Alicia O. Valle a date on which to schedule a settlement conference to resolve any remaining issues, including compensatory damages and reasonable costs and attorneys' fees.  The parties shall further propose an expedited briefing schedule with regards to such issues.  The settlement conference shall take place on or before **March 17, 2015.**


**DONE and ORDERED** in Fort Lauderdale, Florida, this 10th day of February, 2015.


_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**


Copies to:

CASE NO.  14-CIV-60085-BLOOM/Valle

Counsel of Record